The Bulkley Building Company v. Commissioner.
Bulkley Bldg. Co. v. Commissioner
Docket No. 107145.
United States Tax Court
1943 Tax Ct. Memo LEXIS 474; 1 T.C.M. (CCH) 528; T.C.M. (RIA) 44342; February 2, 1943
*474 R. J. Bulkley, Esq., 520 Bulkley Bldg., Cleveland, O., and I. W. Sharp, Esq., 530 Bulkley Bldg., Cleveland, O., for petitioner. Lawrence R. Bloomenthal, Esq., for respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioner's tax liability for the year 1937 as follows: (a) income tax, $19,139.57, and (b) excess-profits tax $12,894.30. The issues raised by the pleadings are: (1) whether petitioner realized taxable gain in the amount of $177,085.25 as a result of the purchase of its own debentures, together with accrued interest, at less than face value in the taxable year; (2) whether respondent properly disallowed as deductions amortization of discount claimed by petitioner on its Series A and Series B income debentures; (3) whether respondent properly disallowed part of the deduction claimed by petitioner on account of depreciation of a certain theatre building; (4) whether respondent properly included in taxable income of petitioner interest in the amount of $24,360 accrued during the year 1937 on $406,000 principal amount of first mortgage bonds of petitioner's wholly owned subsidiary; and (5) whether respondent properly *475 disallowed a deduction for loss of petitioner's investment in certain real property which allegedly became worthless and was charged off petitioner's books during the taxable year. The facts were established by oral and documentary evidence, and stipulation of the parties filed at the hearing. Such stipulation is adopted in full as a part of our findings of fact, and sufficiently summarized below for present purposes. Findings of Fact Petitioner is an Ohio corporation, organized in 1919, with its principal office at Cleveland. At all times pertinent here, its books of account were kept, and its income tax returns made, on an accrual basis. It filed its income and excess profits tax return for the calendar year 1937 with the collector for the 18th district of Ohio. Petitioner is engaged principally in the operation of a commercial and office building, the rental to lessees for operation of a theatre building, and the operation through wholly owned subsidiaries of a garage building, all located on property situated in the City of Cleveland, Ohio. Prior to December 20, 1933, petitioner had outstanding an issue of $513,000 principal amount of six percent gold debentures, some of which *476 had already matured, and the Dodge Court Company, a wholly owned subsidiary of petitioner, had outstanding $406,000 principal amount of first mortgage leasehold six percent gold bonds, secured by a mortgage on its leasehold estates in the garage property, some of which bonds had already matured. The Dodge Court bonds were guaranteed as to payment of principal and interest by petitioner. Both issues of securities were in default as to interest and maturities which became due on and after January 1, 1933. A readjustment plan for petitioner's debentures and the leasehold bonds of its subsidiary was proposed by petitioner under date of December 20, 1933. This voluntary plan was subsequently made the basis of proceedings under section 77-B of the Federal Bankruptcy Act, in which proceedings the plan was confirmed and made effective by order of the United States District Court for the Northern District of Ohio, Eastern Division, on December 10, 1935. Under the readjustment plan and order of the Court, the Dodge Court bonds were exchanged (or barred from all rights except the right to be exchanged) for equal principal amounts of a new issue of Series A Bulkley Building Company cumulative *477 income debentures, bearing interest at the rate of six percent per annum from July 1, 1932, the last date to which interest had been paid on the old bonds. Under the same plan and court order, the Bulkley Building Company gold debentures were exchanged (or barred from all rights except the right to be exchanged) for equal principal amounts of a new issue of Series B Bulkley Building Company income debentures, bearing interest at six percent per annum from November 1, 1932, the last date to which interest had been paid on the old gold debentures. Pursuant to the terms of the readjustment plan, the Series A income debentures were secured by deposit with the trustee of all old Dodge Court bonds which had been exchanged for them, and the Series B income debentures were secured by the deposit with the trustee of all old Bulkley Building Company gold debentures which had been exchanged for them. The old Dodge Court bonds and the old Bulkley Building gold debentures deposited with the trustee under the debenture agreement were required by the terms of the plan to be kept alive and remain pledged as security for the performance of petitioner's obligations with reference to the two series *478 of income debentures. The Series A and Series B cumulative income debentures issued by petitioner both mature on January 1, 1943. Prior to maturity interest if payable only to the extent of the consolidated net income of petitioner and its subsidiaries as defined in the reorganization plan and debenture agreement. All unpaid interest accrues, however, and matures with the principal on January 1, 1943. The old Dodge Court bonds and the old Bulkley Building debentures, including accumulated and unpaid interest, had a fair market value of approximately 9 percent of their respective principal amounts at the time of their acquisition by petitioner in December 1935, pursuant to the order of the court. The new Series. A and Series B income debentures, issued in exchange for the old bonds and debentures, with accumulation of unpaid interest thereon, also had a fair market value of approximately 9 percent of their respective principal amounts at the time and immediately after issuance. During the calendar year 1937, petitioner purchased outstanding Series A income debentures in the principal amount of $73,200, on which interest had accrued at the rate of six percent per annum from July *479 1, 1932 to January 1, 1937 in the amount of $19,764, for purchase prices which aggregated $23,682.50. During the same year petitioner also purchased outstanding Series B income debentures in the principal amount of $114,000, with accumulations of interest at six percent per annum from November 1, 1932 to January 1, 1937, in the amount of $28,500, for purchase prices which aggregated $34,696.25. The income debentures of both series so purchased by petitioner were held uncancelled in petitioner's treasury and carried on its books as assets at their cost to petitioner. No gain was shown on petitioners' books of account, or reported in its income tax return for the year 1937, with reference to the purchase of Series A and Series B debentures. In his determination of the deficiency, respondent charged petitioner with the receipt of taxable gain from such purchases in the amount of $177,085.25, being the difference between the aggregate amounts owed for principal and interest on the purchased debentures as of January 1, 1937, and the aggregate of the amounts paid for same by petitioner. Respondent also excluded from the deductions, in computing petitioners' taxable net income, $12,192 of *480 interest accrued during the year 1937 on the debentures so purchased, of which amount $11,125.02 had accrued prior to the time of purchase by petitioner. Petitioner was required by the terms of the ground leases under which it held its various properties to pay ground rents, as a condition of its continued right to use and occupy the premises, during the year 1937 in the amount of $50,266.67, plus real estate taxes and assessments in the amount of $67,617.76. On its balance sheet attached to its income tax return for 1937, petitioner included among its assets "Stocks of domestic corporations" in the amount of $360,500, which consisted of $350,000 in six percent cumulative preferred stock of the Dodge Court Company, $10,000 in common stock of the same company, and $500 in common stock of the Cuyahoga Garage Company. The Dodge Court Company and the Cuyahoga Garage Company, hereinafter called Garage Company, are wholly owned and subsidiaries of petitioner. The Dodge Court Company was organized in 1924 to own and hold certain leasehold estates and garage buildings, which were located on Dodge Court in the City of Cleveland, Ohio. The Garage Company was organized in 1924 to take a lease *481 from the Dodge Court Company and operate the business of an automobile storage garage on the premises. The lease provided for the payment of rental in the amount of $100,000 during the calendar year 1937. After providing for an expense of $100,000 for rent due to the Dodge Court Company the books of the Garage Company showed an operating loss for several years prior to 1937. The accumulated deficit in the earned surplus account of the Garage Company at the beginning of the year 1937 was $716,943.10; its operating loss during the year 1937 was $86,301.46, and the deficit in its earned surplus account at the end of that year was $803,244.66. At the beginning of the year 1937 the Garage Company owed the Dodge Court Company $729,857.25 and the Bulkley Building Company $8,296.32. At the end of the year 1937, the Garage Company owed Dodge Court Company $803,286.42, and the Bulkley Building Company $11,089.77. The Dodge Court Company's only source of revenue was rental on its garage building and facilities, which were leased to the Garage Company on a lease which called for a rent of $100,000 per year during the calendar year 1934 and thereafter, on which Dodge Court Company collected *482 year by year whatever the Garage Company was able to pay out of its profits from the operation of the garage, and charged off the balance as uncollectible. The amount of rental actually paid by the Garage Company in the taxable year 1937 was $26,570.83, and the amount charged off as uncollectible by the Dodge Court Company for that year was $73,429.17. The accounts, receivable from the Garage Company in the amount of $8,296 at the beginning of the year 1937 and in the amount of $11,089.77 at the end of the year 1937, shown as assets on the balance sheets of petitioner, were claims against the Garage Company and had only such value, if any, as could be realized upon them out of the assets of the Garage Company. The accounts receivable from the Dodge Court Company, shown as assets on the balance sheets of petitioner, in the amount of $236,070.28 at the beginning of the year 1937 and in the amount of $219,320.36 at the end of the year 1937, the interest receivable on Dodge Court company bonds shown on petitioner's balance sheets in the amount of $122,774.40 at the beginning of the year 1937 and $154,077 at the end of the year 1937, and the bonds of domestic corporations (Dodge Court *483 Company) shown on petitioner's balance sheets in the amount of $392,945.76 at the beginning of the year 1937 and $385,903 at the end of year 1937, were all claims against the Dodge Court Company and had a value only equal to the amount, if any, which could be collected on them from the Dodge Court Company. The assessed values of the land and buildings which petitioner owns or holds under lease in the City of Cleveland, Ohio, including the interests of the lessors as well as the interests of petitioner and its subsidiaries, as fixed by the county auditor of Cuyahoga County for purposes of the tax on real estate for the years 1932 to 1941, inclusive, were as follows: Year
Land
Buildings
Total
1932
$1,451,700
$1,371,710
$2,823,410
1933-1936
1,161,370
1,165,960
2,327,330
1937
1,225,710
1,170,480
2,396,190
1938-1941
1,225,710
1,172,990
2,398,700
Prior to the year 1929, petitioner acquired 38 vacant lots located in Parma, Ohio, on which petitioner's basis for computation of gain or loss was $53,387.53. After the year 1932, petitioner ceased to pay the taxes and assessments which were levied against this property. The assessed values of the lots for the purposes *484 of real estate tax, and the amounts of taxes, assessments and penalties levied against them for the years 1931 to 1937 were as follows: Assessed
Amount of Taxes and Assessments
Value
For the Year
Cumulative Total including Penalties
1931
$10,680
$1,427.07
$1,427.07 Billed and paid in 1932
1932
8,450
1,413.99
1,413.99 Billed in 1933 but not paid
1933
6,780
1,331.37
2,866.41 Billed in 1934 but not paid
1934
6,780
1,262.42
4,257.54 Billed in 1935 but not paid
1935
6,780
1,280.61
5,665.03 Billed in 1936 but not paid
1936
6,780
1,111.81
6,907.11 Billed in 1937 but not paid
1937
6,610
1,109.53
8,118.48 Billed in 1938 but not paid
Of the total taxes, assessments and penalties in the amount of $6,907.11 shown as billed in 1937, the amount of $506.91 was made up of penalties, which, together with interest might have been avoided by paying the $6,400.20 of original taxes and assessments in December 1937 under favor of a special statute known as the Whittemore Act. Under that Act and similar predecessor acts it would have been possible to have paid the taxes and assessment accrued up to date without penalty and interest during any one of several years *485 preceding the year 1937. In December 1937 petitioner charged off its investment in the lots as worthless, and claimed in its income tax return for 1937 a deductible loss of $53,387.53. Title to this property was not relinquished at any time prior to or during 1937. The taxes above referred to become a lien on the property in April of the year preceding the year in which billed. The law of Ohio required that the property be assessed at its full true value in money. Petitioner had the money with which to pay the accrued taxes, but upon consideration of the problem as to whether it should pay the taxes and save the property or whether it should abandon the property by not paying the taxes, it was decided to abandon the property and charge the investment off the books as a loss. No proceeding was instituted for foreclosure of the tax lien prior to the close of the year 1937. Petitioner is the owner of a theatre building known as the Allen Theatre, with a lobby entrance through the Bulkley Building on Euclid Avenue, in the City of Cleveland, Ohio, seating approximately 3,000 people. The total cost of this theatre and its equipment, including carrying charges during construction, was *486 approximately $1,191,000, of which $400,000 was petitioner's contribution and constitutes petitioner's basis for the computation of depreciation, dating from January 1, 1923. Petitioner had uniformly set up depreciation on this building on its books and claimed deductions for depreciation in its income tax returns on the basis of an estimated useful life of 30 years from January 1, 1923. This basis was never questioned by respondent prior to his examination in connection with the determination of the income tax liability of petitioner for the calendar year 1937. Depreciation set up on petitioner's books and claimed in its income tax returns to January 1, 1937 amounted to $186,666.62, so that on the basis adopted by petitioner there remained an underpreciated basis at January 1, 1937, of $213,333.38. Respondent computed the depreciation allowable on the theatre building for the year 1937 on the basis of a useful life of 50 years from January 1, 1923, resulting in the allowance of the amount of $5,925.93 instead of $13,333.33, as claimed by petitioner. The consolidated gross income of petitioner and its two subsidiaries over operating expenses, deductions exclusive of theatre depreciations *487 and interest accrued but not paid, on bonds and debentures, loss before provision for theatre depreciation and interest accrued but not paid on bonds and debentures, and loss after provision for theatre depreciation and interest on bonds and debentures for the years 1932 and 1933 were as follows: 1932
1933
Gross Income
$170,023.73
$ 14,045.51
Deductions exclusive of Theatre Depreciation and accrued
but not paid Interest on Bonds and Debentures
178,506.28
124,236.18
Loss before Provision for Theatre Depreciation and Interest,
accrued but not paid, on Bonds and Debentures
$ 8,482.55
$110,190.67
Provision for Theatre Depreciation
13,333.33
13,333.33
Interest, accrued but not paid, on Bonds and Debentures
16,310.00
57,046.00
Loss after Provision for Theatre Depreciation and Interest
on Bonds and Debentures
$ 38,125.88
$180,570.00
The gross income of petitioner, deductions exclusive of theatre depreciation and interest on debentures, loss before provision for theatre depreciation and interest on debentures, and loss after provision for theatre depreciation and interest on debentures for the years 1934, 1935 and 1936 were as follows: 1934
1935
1936
Gross Income
$214,647.24
$241,737.79
$276,117.96
Deductions exclusive of Theatre Deprecia-
tion and Interest on Debentures
306,791.91
310,230.17
281,466.71
Loss before Provision for Theatre Deprecia-
tion and Interest on Debentures
92,144.67
68,492.38
5,348.75
Provision for Theatre Depreciation
13,333.33
13,333.33
13,333.33
Interest on Debentures
33,426.00
33,843.67
55,140.00
Loss after Provision for Theatre Deprecia-
tion and Interest on Debentures
$138,904.00
$115,669.38
$ 73,822.08
*488 The Allen Theatre building owned by petitioner was constructed of steel and concrete and, disregarding obsolescence, might reasonably be expected to have a physical life of 50 years from January 1, 1923. It is well adapted for the purposes of a motion picture theatre. Since the building was constructed sound equipment and talking pictures have been developed which have largely eliminated orchestras in motion picture theatres, resulting in the presentations of productions continuously in darkened houses. Numerous neighborhood theatres have been constructed since petitioner's theatre building was completed. The development of the radio has also largely occurred since petitioner's theatre was constructed and began operations. The rentals received by petitioner from the Allen Theatre during the years 1924 to 1941, inclusive, including contributions to property taxes in those years in which the lease in effect required the lessee to bear the taxes on the theatre property, and adjusted for the year 1932 by deduction of accrued rental which had to be charged off in that year as uncollectible, may be summarized as follows: The rent collected, exclusive of taxes for each of the years 1924 *489 to 1931, both inclusive, was approximately $76,495; the lowest rental, including taxes, collected in such period was $92,230.93 in 1924, and the highest rental collected, including taxes, in such period was $96,380.16 in 1931. The net rental collected in 1932, including taxes, was $51,242.60. No rental was collected in 1933 other than $17,051.13 taxes. During the period 1934 to 1941, both inclusive, no taxes were paid by the lessee, and the lowest rental received by petitioner was $9,917.51 in 1934. The highest rental collected during such period was $46,691.10 in 1941. In the tax year 1937, the rental received by petitioner was $40,014.77. There were outstanding throughout the year 1937 a total of 27,400 shares of preferred stock of petitioner of the par value of $100 each, distributed among more than 1,200 holders, and 140,000 shares of the common stock of petitioner distributed among more than 1,300 holders. These shares were not listed on any stock exchange, but there were a few sales "over the counter" from time to time. No sales of either preferred or common shares of petitioner's stock came to the attention of petitioner's officers during the years 1937 and 1938 at prices *490 in excess of $1 per share for the preferred shares and 2 cents per share for the common shares. On December 31, 1937, the current assets of petitioner and its subsidiaries, as shown on the consolidated balance sheet, amounted to $182,205.04, and the liabilities, other than for principal and interest on outstanding debentures, totaled $92,972.19, leaving an excess of current assets over liabilities, other than liabilities on debentures, of $89,232.85. The principal amount of debentures outstanding (excluding those held in petitioner's treasury) was $715,800, and accumulated interest liability on the debentures was $228,234, or a total liability for principal and interest of $944,034. The fixed assets of petitioner and its subsidiaries appeared on the consolidated balance sheet at $3,971,312.59. In addition petitioner had a concealed liability of approximately $125,000 arising out of a deferment of rental, which would have accrued during the 5-year period ended December 31, 1937, under the original leases, until the 5-year period beginning January 1, 1943. Such deferment resulted from amendment of the leases whereby the rental payable was reduced approximately $125,000 during the 5-year *491 period ended December 31, 1937, in consideration of an increase in the rentals of approximately the same amount during the 5-year period beginning January 1, 1943. The net liabilities for principal and interest on debentures on deferred rental, which could be paid only out of the fixed assets of petitioner and its subsidiaries, amounted to approximately $979,801.15 at December 31, 1937. The value of petitioner's fixed assets, as carried on the consolidated balance sheet at December 31, 1937, under the designation of plant equipment, less reserves for depreciation, was $3,941,901.54. The fair market value of petitioner's fixed assets, including leasehold estates and buildings, at December 31, 1937, was $1,000,000. Petitioner's theatre building, known as Allen Theatre, had an economic or useful life of 30 years from January 1, 1923. Petitioner's investment of $53,387.53 in the vacant lots located in Parma, Ohio, became worthless in the taxable year 1937. Opinion Issue 1. Did petitioner derive taxable gain as the result of purchasing its own debentures at less than face value, under the circumstances set out in our findings of fact above? During the taxable year 1937 petitioner *492 purchased its own outstanding Series A and Series B income debentures in the principal aggregate amount of $187,200, on which interest had accrued in the total amount of $48,264, or a total of principal and interest of $235,464. The total purchase price paid by petitioner for these bonds was $58,378.75. The difference between the two latter sums, or $177,085.25, respondent treated as taxable income. Petitioner contends that it derived no taxable gain from the transaction, but if it should be held that it did derive taxable gain, then the amount is less than that determined by respondent. A solvent corporation which purchases its own bonds at less than issuing price, thereby realizes taxable gain in the amount of the assets previously offset by the obligation of the bonds so purchased. ); ). An insolvent corporation which purchases its own bonds at less than face value, and is still insolvent after the transaction, realizes no taxable gain for the reason that no *493 assets are freed from the claims of creditors. ; . If an insolvent corporation procures the cancellation of claims against it so that thereafter it is solvent, with net assets over liabilities to creditors, it realizes taxable income to the extent of its net worth or the amount of assets so freed. , see also . As to so much, the parties are in agreement, but petitioner contends that it was insolvent both before and after it purchased its own debentures in the taxable year, while respondent argues that petitioner was solvent both before and after those transactions. The record discloses that at December 31, 1937, petitioner's current assets exceeded its liabilities, other than liabilities on debentures, in the amount of $89,232.85; its total liability for principal and interest on debentures amounted to $944,034, and there was additional concealed liability for deferred rental of approximately $125,000, *494 so that its net liability on the debentures and for deferred rental, which could be paid only out of fixed assets, was approximately $979,801.15. The question of whether or not petitioner was solvent in the sense that assets exceeded liabilities to creditors, after the purchase of its debentures, therefore, depends upon the value of its fixed assets, consisting of buildings and leasehold estates. It is upon this point that the parties are in disagreement. Petitioner offered the testimony of one expert witness, who indicated that in his opinion petitioner's building at the basic date had a fair market value of approximately $400,000. Respondent offered the testimony of three expert witnesses, each of whom testified to a value of approximately $1,000,000. The depreciated cost, as shown by petitioner's sheet at December 31, 1937, was slightly less than $4,000,000. From a careful consideration of all the evidence on this question, including an analysis of the factors used by the several expert witnesses as the basis for their opinions, and the argument of counsel on brief, we have reached the conclusion, and so found, that the fair market value of the property in controversy was $1,000,000. *495 An extended discussion of the voluminous testimony would serve no useful purpose here. It follows that at December 31, 1937, after the purchase of its debentures, petitioner's assets exceeded its aggregate liabilities to creditors in the amount of $20,198.85, and on such basis was solvent. It also appears that during the taxable year petitioner was a going concern, in complete and unrestricted control of its business affairs, and had sufficient funds to meet all current obligations. We hold, therefore, that petitioner realized taxable income as the result of the purchase of its own debentures in 1937. It is apparent, however, that petitioner's liabilities exceeded its assets prior to the purchase, for $58,378.75, of debentures in the amount of $235,464, including $48,264 accrued interest, since it thereby reduced its liabilities in the amount of $177,085.25 but freed assets from claims of creditors only to the extent of $20,198.85. More simply stated, petitioner was insolvent at the beginning of the taxable year, but as the result of the purchase of its debentures in the same year it became solvent, with net assets of $20,198.85 over and above all liabilities to creditors. This *496 brings the present proceeding squarely within the rule of , and See also the discussion in . Petitioner urges that, disregarding the question of solvency, it derived no taxable gain from the purchase of its debentures, at least in respect of the Series A debentures, for another and different reason. Petitioner says that in legal effect it sold its Series A debentures in 1935 at the cash equivalent of 9 percent of principal amount; that the resulting discount should be amortized over the life of the debentures and that such amortization to December 1937 amounted to approximately 32 percent, which would provide a basis for computing gain or loss of approximately 41 percent of the principal amount, and since the debentures were purchased in 1937 at less than 41 percent of the face value, loss was sustained on the transaction rather than gain realized. We can not agree with petitioner's contention on this point. In 1935 it is apparent that petitioner's wholly owned subsidiary (the Dodge Court Company) *497 was insolvent. It had defaulted in payment of both principal and interest on its bonds, which had been guaranteed by petitioner. Petitioner likewise was in default on its own bonds. To relieve this situation and strengthen its financial position, petitioner, pursuant to order of the court in the proceeding under section 77-B of the Bankruptcy Act, issued the Series A income debentures in exchange for the old bonds of its subsidiary, and the Series B income debentures in exchange for its own old gold debentures. Both series of income debentures were exchanged for equal principal amounts of the old bonds and debentures. Petitioner's secondary liability as guarantor of its subsidiary's bonds had in these circumstances become in effect a primary liability. The new debentures were not "sold" in either a practical or legal sense; they were simply exchanged for and took the place of the old bonds and debentures, although the latter were kept alive as security for the performance of petitioner's obligations under the new securities. The purpose plainly was to amend the terms of the old securities so as to relieve petitioner of a financial burden which it was unable immediately to meet. The *498 new securities bore the same rate of interest as the old, and petitioner became the primary obligor in form as well as fact. The only substantial change effected by issuance of the new securities was to extend the maturity dates of the old obligations. There was no substantial change in the investment of the bondholders. The transactions, when viewed as a whole, constituted a recapitalization of petitioner, which was a reorganization giving rise to neither gain nor loss recognizable for tax purposes. Section 112(b) (3) and (g) (1) (D), Revenue Act of 1934. Cf. , affirming . Petitioner so treated the transaction in its income tax return for 1935. The basic or issuing price of the old bonds and debentures is assumed to be par, there being no evidence to the contrary, and it follows that the basic or issuing price of the new income debentures was not 9 percent but face value. Hence, petitioner derived gain from the purchase of the new debentures in 1937 at price less than par, and realized taxable gain to the extent that assets were thereby freed from claims of creditors *499 in the amount of $20,198.85. Petitioner also urges the further contention that in any event cancellation of the accumulated interest on the purchased debentures could not result in taxable income, since such interest accrued in loss years and resulted in no tax benefit to petitioner. The stipulated facts show that petitioner did not derive any tax benefit from deductions for accrued interest on the debentures in question, but this becomes immaterial here for the reason that, disregarding the accrued interest, petitioner still derived gain from the purchase of its debentures, resulting in net assets freed from claims of creditors in the amount before stated. On the first issue, respondent's determination is approved to the extent of including in taxable income the sum of $20,198.85. Issue 2. Did respondent properly disallow deductions for amortization of discount claimed by petitioner on its Series A and Series B debentures? Petitioner contends that in legal effect, it sold both series of debentures at a discount measured by the difference between par and the fair market value of the property received therefore (the old bonds and debentures), and that such discount should be *500 amortized over the life of the bonds. Petitioner further says that in computing its taxable income for 1937 it is entitled to deduct a proportionate part of the discount on the bonds which remained outstanding during the entire year, on which basis it would be entitled to a deduction of $50,688 on the Series A debentures and a deduction of $62,700 on the Series B debentures. Petitioner urges these contentions without qualification in respect of Series A debentures, but expresses some doubt of the application of its theory in respect of Series B debentures. We think petitioner's contention can not be sustained in the case of either series of debentures. As we pointed out in our discussion under Issue 1, petitioner did not sell its income debentures at a discount or otherwise, but merely exchanged them for old securities issued by itself and its wholly owned subsidiary, under such circumstances that rendered the transaction a tax-free reorganization. Discount is a species of loss, and it is on that underlying basis that amortization deductions are allowable, but neither gain nor loss resulting from a recapitalization-reorganization is recognizable for tax purposes. In such case there *501 is no closed transaction deemed sufficient to provide a basis for taxation. In the instant proceeding there was no closed transaction. The investment of the bondholders after the exchange of the securities remained substantially the same as before. No recognizable gain or loss resulted to the bondholders. It would be anomalous to ascribe a different result to petitioner corporation. There was no substantial change in petitioner's liability. The only material effect of the transaction was to extend the due date or maturity of petitioner's obligations. The exchange of debentures for bonds and debentures was wholly without tax consequence. In the case at bar, we think it is plain that, aside from the fact that the transaction was a tax-free reorganization, petitioner is not entitled to deductions for amortization for the reason that it did not issue its Series A or Series B income debentures under circumstances which were the equivalent of "discount." On the second issue, respondent's action is approved. Issue 3. Did respondent properly disallow part of a deduction claimed by petitioner for depreciation on its Allen *502 Theatre building? The parties agree that this building cost approximately $1,191,000, of which $400,000 was petitioner's contribution and constitute petitioner's basis for the computation of depreciation, dating from January 1, 1923. The parties also agree that the building had a physical life of 50 years from January 1, 1923. Petitioner had uniformly claimed deductions for depreciation on the basis of a useful life of 30 years, and this basis was never questioned by respondent prior to his determination of the deficiencies for 1937. Respondent computed depreciation allowable for the taxable year on the basis of a physical life of 50 years, instead of a useful life of 30 years, from January 1, 1923, which resulted in the allowance of the amount of $5,925.93 instead of $13,333.33, as claimed by petitioner. It is petitioner's contention that the allowance of a deduction for depreciation on the basis of the physical life of the building should be increased by an allowance for obsolescence on the basis of the useful life of the building; in other words, that the combined allowance for depreciation and obsolescence should be computed on the basis of a useful life of 30 years. Section *503 23 (1) of the Revenue Act of 1936 authorizes a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. Much evidence was offered at the hearing on the question of obsolescence, and the various factors involved. From a careful consideration of such evidence, we have found that the economic or useful life of the building was 30 years from January 1, 1923. It follows that the deduction claimed by petitioner for depreciation and obsolescence represents a reasonable allowance. Respondent's action on the third issue is disapproved. Issue 4. Did respondent properly include in petitioner's taxable income interest in the amount of $24,360 accrued in 1937 on $406,000 principal amount of first mortgage bonds of the Dodge Court Company held by petitioner? In brief, petitioner contends that at the close of the taxable year the ultimate payment of this interest by its subsidiary was so doubtful that the item should not have been accrued or included in income, even though petitioner was on an accrual basis. In the light of the facts in the record, we think petitioner must be sustained on this point. *504 It is well settled that if there is a reasonable and substantial doubt as to whether accruable income is collectible, it should not be included in taxable income. ); , affirmed, , certiorari denied, ; ; ; , affirmed, . In such circumstance, it is immaterial that the taxpayer was on an accrual basis, and it is likewise immaterial that the taxpayer accrued the amount and reported it as taxable income. "If it in fact was not taxable income, an entry on petitioner's books treating it as income could not make it such." The Dodge Court Company's only source of revenue *505 was the rental it received on its garage building leased to the Cuyahoga Garage Company. Both of these subsidiaries of petitioner were insolvent. At the beginning of the taxable year 1937 the Garage Company owed the Dodge Court Company $729,857.25, although the amount was shown on the balance sheet of the Dodge Court Company as $462,414.93 because of the fact that the latter company wrote off each year as uncollectible all rental accrued over and above cash collections in excess of that amount. During the years 1934 to 1941, both inclusive, the Garage Company paid to the Dodge Court Company an average annual rental of less than $15,000. The Garage Company was also indebted to petitioner in the amount of $8,296 at the beginning of the year 1937, and in the amount of $11,089.77 at the end of that year. The Dodge Court Company was indebted to petitioner on open account in the amount of $236,070.28 at the beginning of 1937, and petitioner's balance sheet at the beginning of that year disclosed interest receivable on Dodge Court bonds in the amount of $122,774.40. These facts, in our opinion, amply justify the conclusion that there was no reasonable prospect that petitioner would be able *506 to collect the additional interest of $24,360 accrued on the Dodge Court bonds for 1937. The amount, therefore, should not have been accrued on petitioner's books nor included in its taxable income. The action of respondent on the fourth issue is reversed. Issue 5. Did respondent properly disallow a deduction for loss of petitioner's investment in certain real estate? Prior to 1929 petitioner acquired 38 vacant lots located at Parma, Ohio, and it is agreed by the parties that petitioner's basis for gain or loss thereon is $53,387.53. There is no controversy that petitioner lost the full amount of its investment. The only question presented for our decision - a very narrow one - is whether the loss was sustained in the taxable year 1937, as contended by petitioner, or in the prior year 1936, as contended by respondent. After 1932, petitioner ceased to pay the taxes and assessments levied against these lots, and the total taxes accumulated to the end of 1936 exceeded the assessed value. The taxes for 1936 were not billed until 1937, but became a lien on the property in the preceding April. Petitioner was financially able to pay all the accrued taxes, but in December 1937, upon *507 formal consideration of the matter, decided to abandon the property by not paying the taxes. Also, at that time it charged off its investment as worthless, and claimed a deductible loss of $53,387.53 in its income tax return for 1937, which was disallowed by respondent. Prior to the close of the taxable year no proceeding had been instituted for foreclosure of the tax lien. It was petitioner's responsibility to determine in the first instance the year in which the loss was sustained. In discharge of that responsibility, petitioner affirmatively and after careful consideration of the matter concluded that the loss was sustained in 1937. Nothing appears in the record to question the bona fides of that decision. There was then no tax controversy involving the point, and so far as petitioner knew, it was wholly immaterial for tax purposes whether the loss was sustained in the one year or the other. Petitioner's income tax returns for 1936 and 1937 each disclosed an operating loss far in excess of the loss sustained on the Parma lots. Respondent argues that because the aggregate taxes, which had become a lien on the property at the end of 1936, exceeded the assessed value, the loss was *508 sustained in that year. Such conclusion overlooks the fact that the total assessed taxes did not exceed assessed value until the 1936 taxes were billed in 1937; and in any event, petitioner could at any time in 1937 have paid the taxes without interest or penalties and freed its property from all liens, if it had thought its investment could be saved. The evidence, we think, is insufficient to require us to disturb petitioner's determination of the year in which the loss was sustained. Respondent's action on this issue is reversed. Decision will be entered under Rule 50.